# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

COMMODITY FUTURES TRADING
COMMISSION,

                Plaintiff,

      v.

AUREUS REVENUE GROUP LLC,
and EMIR JESUS MATOS
CAMARGO

              Defendants.

Civil Action No. 6:24-cv-1603

**COMPLAINT FOR CIVIL MONETARY PENALTIES,
RESTITUTION, AND OTHER EQUITABLE RELIEF UNDER
THE COMMODITY EXCHANGE ACT,
WITH PERMANENT INJUNCTIVE RELIEF REQUESTED**

Plaintiff Commodity Futures Trading Commission ("CFTC" or

"Commission"), by and through its attorneys, alleges as follows:

## I.    SUMMARY

1.    From at least September 10, 2019, through at least

November 11, 2022 (the "Relevant Period"), Emir Jesus Matos Camargo

("Matos"), individually and as an agent and principal of Aureus Revenue

Group LLC ("Aureus") (collectively, "Defendants"), operated a fraudulent

scheme in which Aureus solicited, accepted, and received funds for a pooled

"Investment Fund" that traded commodity futures contracts referencing the S&P 500 Index (the "Aureus Pool").

2.     Matos, as an agent and principal of Aureus, knowingly or recklessly made fraudulent and material misrepresentations and omissions about the legitimacy, profitability, and risk of the Aureus Pool to individuals in soliciting contributions to the Aureus Pool.  Many of the individuals Matos solicited were immigrants to the United States from Spanish-speaking countries.  Through such solicitations, Defendants persuaded at least thirty-two individuals and entities ("Pool Participants") to transfer at least $1.5 million to Defendants for participation in the Aureus Pool.

3.     Defendants convinced Pool Participants to contribute money by promising guaranteed returns of 1.5–3.75% each month, depending on the contribution amount.  Defendants also sent prospective Pool Participants a fictitious license purporting to show that the CFTC licensed Aureus as an investment fund.  This fictitious license contained a counterfeit CFTC seal, a forged signature of a former CFTC Commissioner, and a fictitious license number.  The fictitious license mischaracterizes the Aureus Pool, an investment fund for the purpose of trading futures contracts referencing the S&P 500 Index, as an "S&P 500 Index Fund."  Further, in exchange for their contributions, Defendants gave Pool Participants "warranty checks"—checks drawn on an Aureus bank account for the full amount contributed.  These

2

warranty checks provided Pool Participants a false sense of security concerning their participation in the Aureus Pool.  In reality, the warranty checks were written on accounts with insufficient funds to honor the checks.

4.    Defendants engaged in limited and unprofitable futures trading and instead misappropriated most of the money received from Pool Participants.  Some pool funds were misappropriated for Aureus's benefit to pay certain Pool Participants guaranteed monthly returns from funds deposited by other Pool Participants in the manner of a Ponzi scheme, rather than from Defendants' claimed trading profits.  Other misappropriated funds were used by Defendants to pay for, among other things, Matos's rent, living and travel expenses, and personal taxes.

5.    In or around summer 2022, Defendants stopped making monthly payments to Pool Participants.  Around the same time, Defendants attempted to conceal their fraudulent scheme.  Defendants crafted a story that the Aureus trading account was frozen in an audit by Firm A, a Commission-registered futures commission merchant ("FCM"), and sent Pool Participants fake documents, bearing Firm A's logo, that described the fictitious audit and account freeze.  Later that same year, Defendants showed a Pool Participant's representative false account information that indicated the Aureus Pool had a balance of approximately $3 million in a futures trading account.  In reality, from September 2022 through at least February 2024,

the Aureus Pool never held more than approximately $10,000 in any futures

trading account.

6.      Through this conduct, Matos and Aureus, by and through Matos

and other employees and agents, engaged, are engaging, or are about to

engage in fraudulent and additional acts and practices in violation of the

Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26, and Commission

Regulations ("Regulations"), 17 C.F.R. pts. 1–190 (2023), specifically

Sections 4b(a)(1)(A)–(C), 4k(2), 4m(1), and 4*o*(1)(A)–(B) of the Act, 7 U.S.C.

§§ 6b(a)(1)(A)–(C), 6k(2), 6m(1), 6*o*(1)(A)–(B), and Regulations 4.20(a)(1), (b),

and (c) and 4.21(a)(1), 17 C.F.R. §§ 4.20(a)(1), (b)–(c), 4.21(a)(1) (2023).

In addition, Matos, as a controlling person of Aureus who did not act in good

faith or knowingly induced the violations, is liable for each of Aureus's

violations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

7.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1,

the Commission brings this action to enjoin such acts and practices and

compel compliance with the Act and the Regulations.  In addition, the

Commission seeks civil monetary penalties and remedial ancillary relief,

including, but not limited to, trading and registration bans, restitution,

disgorgement, rescission, pre- and post-judgment interest, and such other

relief as the Court may deem necessary and appropriate.

8.     Unless restrained and enjoined by this Court, the Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.   JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive and other relief against any person whenever it appears to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

10.     Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because the Defendants are found in, inhabit, or transact business in this District, and because acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District. Venue is also proper under 28 U.S.C. § 1391(b) because the Defendants reside in this District.

### III.   THE PARTIES

11.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and Regulations. The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W. Washington, D.C. 20581.

12.     Defendant **Aureus Revenue Group LLC** is a Florida Limited Liability Company formed by Defendant Matos in 2018.  During the Relevant Period, Defendant Matos operated Aureus out of his personal residence in Orlando, Florida.  Aureus acted as a commodity pool operator ("CPO") by soliciting, receiving, and accepting funds from pool participants for investment in the Aureus Pool.  Aureus has never been registered with the Commission in any capacity.

13.     Defendant **Emir Jesus Matos Camargo** is a resident of Orlando, Florida.  Matos co-founded Aureus.  He is the managing member, "Manager Director," [sic] and chief executive officer of Aureus.  Matos opened Aureus bank accounts and was the sole authorized signatory on two of four such accounts.  Matos and his wife were both authorized signatories on two other Aureus bank accounts.  Matos directed all of Aureus's solicitations and pool operations.  Matos solicited Pool Participants and signed agreements on behalf of Aureus with Pool Participants.  Matos also signed "warranty

6

checks" on behalf of Aureus to Pool Participants.  During the Relevant

Period, Matos acted as an associated person ("AP") for CPO Aureus by

soliciting Pool Participants and prospective Pool Participants for the Aureus

Pool.  Matos has never been registered with the Commission in any capacity.

## IV.   FACTS

**A.   Overview**

14.     During the Relevant Period, Aureus, acting as a CPO,

fraudulently solicited and accepted at least $1.5 million from at least thirty-

two Pool Participants.  Aureus pooled those funds for the purported purpose

of trading commodity futures contracts on behalf of the Pool Participants.

Defendants, through the acts of Matos, claimed that Aureus's futures trading

allowed Aureus to guarantee Pool Participants risk-free monthly returns of at

least 1.5%.  Defendants, through the acts of Matos, instructed Pool

Participants to send their funds to one or more accounts controlled by Matos,

including bank accounts held in the name of Aureus as well as Matos's

personal bank account.  In all such accounts, Matos treated the Pool

Participants' funds as his personal funds and commingled other of his

personal funds with Pool Participant funds.

15.     Defendants, through Matos, traded only a small portion of the

Pool Participant funds in commodity futures contracts, and those funds were

traded in the name of Defendants rather than the Aureus Pool.  Matos's

trading resulted in extensive trading losses.

16.     Defendants, through Matos, misappropriated more than $200,000

of the Pool Participant funds for Matos's personal use, including for trading

securities in securities brokerage accounts in his own name.  Additionally, to

perpetuate and conceal the fraud, Defendants also made Ponzi-type

payments to some Pool Participants.

**B.     Defendants Fraudulently Solicited Pool Participants**

17.     On or about September 6, 2018, Matos organized Aureus as a

Florida Limited Liability Company.

18.     During the Relevant Period, Matos solicited Pool Participants

and managed Aureus from Orlando, Florida.

19.     During the Relevant Period, Defendants, through the acts of

Matos, solicited Pool Participants using a license Defendants represented as

being issued by the CFTC to Aureus.  Defendants represented that the

license permitted Aureus to operate an investment fund trading futures

contracts referencing the S&P 500 Index, *i.e.*, using Defendants' terminology,

a "S&P 500 Index Fund."  Defendants used the license to assure prospective

Pool Participants that Aureus was a legitimate company and offered an

investment fund trading commodity futures contracts in a legal and

regulated manner.

8

20.     The license bears a counterfeit CFTC seal and indicates the

CFTC:

Hereby confers upon
Aureus Revenue Group LLC
the recognition of
S&P 500 Index Fund
For having satisfied all the requirements according to the
Commodity Futures Trading Commission rules.
In witness whereof, this license number:
837C-D6F8-5480-4CCD-A596-2803-6F30-0F81
is granted by authority at this month of October, in the year two
thousand eighteen.

The license also contains the name and alleged signature of a former CFTC

Commissioner.

21.     The license is fake.  The CFTC never issued Aureus any

recognition or license, and the CFTC never indicated that Aureus had

satisfied the Act or Regulations.  Likewise, the CFTC never assigned Aureus

any "license number," and the former CFTC Commissioner did not sign the

license.

22.     During the Relevant Period, Defendants, through the acts of

Matos, used the same fake thirty-two-digit alphanumeric CFTC license

number in other documents sent to Pool Participants.  For example,

Defendants included the same fake CFTC license number when issuing a

Pool Participant a "Certificate of Authenticity" on or about

February 18, 2022, that "certif[ied]" a new or additional contribution by the Pool Participant.

23.     During the Relevant Period, Defendants fraudulently solicited Pool Participants with the promise of guaranteed monthly interest returns or profits ranging from 1.5–3.75% per month.  Matos represented to Pool Participants that contributing to the Aureus Pool was risk-free and could yield higher interest than keeping money at the bank.  Defendants' promises of guaranteed monthly interest returns or profits misled Pool Participants about the likelihood of gain and the possibility of loss associated with contributing to the Aureus Pool.

24.     For example, in a document titled "Certificate of Authenticity" which Defendants provided to a Pool Participant on or about February 18, 2022, Defendants indicated the Pool Participant's contribution was "in exchange for a 3.75% monthly rate of profit[.]"  The Certificate of Authenticity was printed on Aureus letterhead and signed, "Grateful for your trust, Yours, [wet-ink signature], EMIR MATOS, CEO. AUREUS REVENUE GROUP, LLC."

25.     During the Relevant Period, Defendants, through the acts of Matos, provided other Pool Participants substantially similar certificates of authenticity that guaranteed 1.5–3.75% monthly profits.

26.     During the Relevant Period, Defendants, through the acts of Matos, made other solicitations to Pool Participants.  The solicitations misled Pool Participants about the likelihood of gain and the possibility of loss associated with participation in the Aureus Pool.  For example, in an "Agreement Between the Parties" dated February 18, 2022, and signed by Matos, Defendants indicated, among other terms:

- Aureus promised to pay the Pool Participant a "3.75% monthly rate";

- a partial or total capital withdrawal was available on 48-hour notice; and

- if Aureus failed to timely honor the capital withdrawal request (including if Matos became incapacitated or died) the Pool Participant was free to deposit an accompanying warranty check—signed by Matos and drawn on an Aureus bank account at a federally insured bank—for the full amount of capital contributed by the Pool Participant.

27.     The "Agreement Between the Parties" dated February 18, 2022, also threatened the Pool Participant that unauthorized use of the warranty check "will imply the loss of your benefits and you will be subject to criminal penalties for FELONY and blockages for future commercial and/or financial transactions in the USA." (emphasis in original).

28.     The "Agreement Between the Parties" dated February 18, 2022, described Matos as the "Manager Director" of Aureus and contained a background image of a logo associated with Aureus.

29.     During the Relevant Period, Defendants provided other Pool Participants substantially similar signed agreements between the parties guaranteeing 1.5–3.75% monthly profits.  During the Relevant Period, Defendants provided other Pool Participants substantially similar warranty checks for the respective amounts they contributed.

30.     During the Relevant Period, Defendants, through the acts of Matos, responded to Pool Participants' requests for account statements by providing the requesting Pool Participants account statements via email. The account statements falsely reported that Pool Participants' accounts had "Ending Balance[s]" reflecting the total of their net contributions and guaranteed profits.  In reality, Defendants had already misappropriated or lost a significant portion of Pool Participants' contributions, and the share of the Aureus Pool available for distribution to Pool Participants was significantly less than the stated "Ending Balance[s]" on the account statements.

31.     During the Relevant Period, many of the Pool Participants were immigrants to the United States from Spanish-speaking countries.

32.     Matos used Pool Participants' unfamiliarity with U.S. laws and financial systems to Defendants' advantage.  Defendants used documents such as the fictitious license to feign compliance with U.S. laws.  Defendants, through the acts of Matos, also threatened that Pool Participants would lose access to the financial system—and even face criminal prosecution—if they attempted to withdraw their capital from Aureus but failed to comply in any respect with Defendants' complicated withdrawal instructions.

## C.     Defendants' Limited Trading Resulted in Nearly Total Losses

33.     During the Relevant Period, Defendants used futures trading accounts at three FCMs to trade a limited amount of the funds provided by Pool Participants.

34.     On or about May 23, 2018, Matos opened an account at Firm A, an FCM, in Matos's own name.  During the Relevant Period, Defendants transferred $160,000 of pool funds to the Firm A account and withdrew about $31,000.  Matos lost the remaining balance of the Firm A account to trading losses, fees, and commissions.  On or about September 10, 2019, the Firm A account had a monthly ending balance of less than $250 and was later closed on or about November 8, 2021.

35.     On or about September 10, 2020, Matos opened an account at Firm B, an FCM, in Aureus's name.  During the Relevant Period, Defendants transferred $40,000 of pool funds to the Firm B account and withdrew about

13

$25,000.  Aureus lost the remaining balance of the Firm B account to trading losses, fees, and commissions.  The Firm B account was closed on or about November 23, 2021.

36.    On or about November 30, 2021, Matos opened an account at Firm C, an FCM, in Matos's own name.  During the Relevant Period, Defendants transferred approximately $39,000 of pool funds to the Firm C account and withdrew approximately $6,000.  Matos lost nearly the entire remaining balance of the Firm C account to trading losses, fees, and commissions.

37.    The Firm C account contained one subaccount (the "Subaccount"), which had an authorized trader in addition to Matos.  During the Relevant Period, the Subaccount received one deposit, totaling $5,000, of which $1,100 was later withdrawn.  Nearly the entire balance of the deposit to the Subaccount was lost to trading losses, fees, and commissions.

38.    Matos exclusively controlled and was the sole authorized trader for the accounts at Firm A, Firm B, and Firm C, with the exception of the Subaccount.  During the Relevant Period, Matos exclusively traded E-mini S&P 500 futures contracts in the accounts at Firm A, Firm B, and Firm C (not including the Subaccount).  The monthly statements during the Relevant Period for accounts at Firm A, Firm B, and Firm C (not including the Subaccount) reflect net trading losses totaling over $160,000.  The monthly

14

statements during the Relevant Period for the Subaccount reflect net trading losses totaling approximately $2,400.

**D.    Defendants Misappropriated Pool Participants Funds**

39.    During the Relevant Period, Defendants received Pool Participants' contributions into accounts Aureus and Matos maintained at federally insured banks.  Matos used Aureus bank accounts as his own and paid some of his personal and living expenses out of Aureus's four accounts at four federally insured banks.

40.    Matos misappropriated more than $200,000 from the Aureus Pool for the benefit of himself and his family to pay for, among other things, rent on his home, groceries, restaurant meals, travel, taxes, and contributions to his personal securities brokerage account.

41.    During the Relevant Period, Defendants misappropriated amounts from the Aureus Pool for Aureus's benefit to repay some Pool Participants fictitious monthly profits.  Defendants generally made payments of fictitious profits via ACH or wire transfer from accounts Aureus maintained at federally insured banks.

42.    Defendants paid Pool Participants fictitious monthly profits to keep the scheme alive by convincing Pool Participants to contribute more to the Aureus Pool or refrain from withdrawing their contributions.

43.     The scheme worked, for a time.  During the Relevant Period, certain Pool Participants saw the monthly payments of fictitious returns come in from Aureus and, believing Aureus was actually yielding profit above their capital contributed, contributed more to the Aureus Pool or refrained from withdrawing capital from the Aureus Pool.  Since the beginning of the Relevant Period, after paying redemptions to Pool Participants of approximately $875,000, the net loss to all Pool Participants is at least $650,000.

**E.     Defendants Fabricated Stories About an Account Audit and Hacking Incident to Cover Up Defendants' Misappropriation and Trading Losses**

44.     In or around summer 2022, Defendants stopped making monthly payments to Pool Participants.

45.     In response, certain Pool Participants demanded Defendants return the capital they contributed to the Aureus Pool.

46.     To explain why Defendants were no longer making monthly payments or returning capital to Pool Participants, Matos concocted a story about a supposed audit by Firm A, an FCM, of Aureus's trading account. Matos told Pool Participants the audit prevented Defendants from withdrawing any funds.

47.     In support of this fake audit, Matos sent Pool Participants fictitious correspondence Defendants purportedly received from Firm A's

16

"Audit Department." The correspondence, dated August 9, 2022, contains letterhead bearing Firm A's logo and address. The correspondence notes that Firm A was a "Registered Futures Commission Merchant," "Registered CFTC," and a National Futures Association member. The correspondence further notes that Aureus operated an investment fund trading futures contracts referencing the S&P 500 Index. The correspondence reads, in pertinent part:

> Dear member: Aureus Revenue Group LLC
> 10825 Tilston PT, Orlando, FL, 32832
> CFTC License Number: 837C-D6F8-5480-4CCD-A596-2803-6F30-0F81
>
> This letter of intention is to inform you that your S&P500 Index Fund is going to be subject to Audit as of date of this missive.
>
> This procedure doesn't respond to any particular reason, is totally random and routine and, more importantly, is unrelated to your performance.
>
> Usually, it doesn't take no longer than 30 business days to make the review, but no withdrawals of any kind can be made during the process; however, the possibility of make deposits and even trading buy/sell transactions, remains in force, without any inconvenience, so, the benefits will continue showing up. Remember that your clients are absolutely protected by the CFTC and their capital it is not at risk regardless of the audit findings.
>
> Audit Department.

48.    In further support of the fake audit, Defendants sent Pool Participants fictitious follow-up correspondence Defendants allegedly received on or about September 19, 2022, from Firm A's "Audit Department."

The follow-up correspondence contains the same counterfeit Firm A letterhead and is addressed to Aureus, noting the same address and fictitious thirty-two-digit alphanumeric CFTC license number.  The follow-up correspondence reads, in pertinent part:

> This letter of intention is to inform you that your S&P500 Index Fund Internal Audit was completed in a <u>successful</u> way.
>
> We will send you the final report once we complete the pending signatures in order of hierarchy, therefore, your release date has been scheduled as the business day on October 03rd 2022, from that moment onwards you will have the availability to fulfill the pending commitments with your value customers.
>
> We recommend keeping the final authenticated report to protect your company from any external regulatory entities.
>
> We understand and apologize for any possible inconvenience, but these types of procedures guarantee the transparency that we have built over 50 years.
>
> Be aware that there is no specific order to comply with probable future audits.
>
> Congratulations,
>
> Audit Department.

49.    Both pieces of alleged correspondence were fictitious.  Aureus was never subject to an audit by Firm A.  In fact, Aureus never had an account with Firm A.  Matos had an account with Firm A that he closed on or about November 8, 2021, nine months prior to the date on the first correspondence.

50.    On or about September 25, 2022, Matos showed a representative
of a Pool Participant a view of a futures trading platform that falsely
indicated Matos had access to approximately $3 million in a trading account
ostensibly frozen in the Firm A audit.

51.    After the fabricated story about a Firm A "audit" ran its course,
Matos began falsely telling Pool Participants that the Aureus trading account
had been infiltrated by a hacker.  Matos organized video conferences, via the
Zoom platform, to discuss the hacking matter with Pool Participants.
Matos asserted that Aureus's futures trading account was hacked by an
external group and that the hack has prevented him from taking money out
to repay Pool Participants.  Matos said as a result of the hack he could not
return any funds, and investors will have to wait until the intruders
occupying the account "leave," so he can recover the money and give it back to
Pool Participants.  Matos also falsely told Pool Participants that Aureus was
reaching $4 million dollars in its futures trading account, and he hopes the
intruders will leave or be caught so Matos can access the money and repay
Pool Participants.

52.    Matos's statements about an alleged hacker and an Aureus
futures trading account with millions of dollars in it were and are false.
In September 2022, there was less than $1,000 in any remaining futures
trading account on behalf of the Aureus Pool and, from September 2022

through February 2024, monthly account statements showed ending balances ranging from less than $5,000 each month to less than $100 in February 2024.

53.     On or about July 4, 2023, Matos also used at least one Zoom video conference to discuss a crime called "debt harassment" and threateningly implied to Pool Participants that by asking for their capital back they were committing that crime.

## F.   Aureus Acted as a CPO Without Registration, and Matos Acted as an Unregistered AP of a CPO

54.     During the Relevant Period, Aureus, through Matos, acted as a CPO by engaging in a business that is of the nature of a commodity pool, and in connection therewith, solicited, accepted, and/or received funds for the purpose of trading in commodity futures.  Furthermore, in connection with Aureus's business as a CPO, Aureus made use of the mails or other means of interstate commerce, which required Aureus's registration as a CPO.

55.     During the Relevant Period, Matos acted in a capacity requiring registration as an AP of a CPO by soliciting Pool Participants and prospective Pool Participants for participation in the Aureus Pool, while being associated with Aureus as a partner, officer, employee, or similar agent.

56.     During the Relevant Period, Aureus was not registered with the Commission as a CPO, and Aureus did not file a notice of exemption from

registration or any annual affirmation of a notice of exemption with the National Futures Association.  During the Relevant Period, Matos was not registered with the Commission as an AP of a CPO as required by the Act and Regulations.

### G.     Matos Acted as a Controlling Person of Aureus

57.     Matos was a controlling person of Aureus.  Matos was the Chief Executive Officer and Manager and held a fifty percent interest in Aureus (until September 30, 2022, when Matos assumed full ownership of Aureus), which in practice allowed him to possess general control over Aureus. Matos also exercised specific control over Aureus, as he was responsible for all trading and other decisions at Aureus and was the primary source of information for Pool Participants regarding Aureus and their funds.

58.     Matos controlled the solicitation, receipt, and acceptance of Aureus Pool funds for the purpose of purchasing or selling commodity interests, including E-mini S&P 500 futures contracts subject to the rules of CME, a designated contract market.

59.     Matos controlled the Aureus bank accounts.  Matos was the sole signatory on two of four of Aureus's bank accounts and a co-signatory on two other Aureus bank accounts.  These four Aureus bank accounts are (mainly) where, during the Relevant Period, Pool Participants transferred funds for the purpose of participating in the Aureus Pool.

21

## H.     Aureus's Failure to Provide Pool Disclosure Documents

60.     During the Relevant Period, Aureus, while acting as CPO of the Aureus Pool, failed to provide pool disclosure documents as required by Regulation 4.21, 17 C.F.R. § 4.21 (2023), including but not limited to documents providing or describing required cautionary statements, risk disclosures, fees and expenses incurred, past performance disclosures, and others.

## V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE
### Violations of Section 4b(a)(1)(A)–(C), 7 U.S.C. § 6b(a)(1)(A)–(C) (Fraud and Deceit)

61.     Paragraphs 1 through 60 are re-alleged and incorporated herein by reference.

62.     Section 4b(a)(1) of the Act, 7 U.S.C. § 6b(a)(1), makes it unlawful:

[F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . .

    (A)  to cheat or defraud or attempt to cheat or defraud the other person;

    (B)  willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;

  (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person . . . .

63. Defendants told Pool Participants that the Aureus Pool would trade futures contracts referencing the S&P 500 Index.

64. During the Relevant Period, as described above, Defendants violated 7 U.S.C. § 6b(a)(1)(A)–(C) by, among other things, and in connection with any order to make or the making of any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person, cheating or defrauding, or attempting to cheat or defraud, prospective Pool Participants and Pool Participants; making false and/or misleading statements of material fact, or omitting material facts, made to prospective Pool Participants and Pool Participants; willfully deceiving or attempting to deceive prospective Pool Participants and Pool Participants; and, misappropriating Pool Participant funds.

65.   Defendants committed these violations by, among other things:

a.  Misrepresenting expected profits by promising grossly inflated and guaranteed profits without any basis to make such claims or promises;

b.  Misrepresenting expected risk of loss by wholly negating any such risk in Defendants' solicitations to Pool Participants, including by providing "warranty checks" that falsely guaranteed Pool Participant contributions were available;

c.  Misrepresenting Aureus's registration with the Commission and compliance with the Regulations by providing Pool Participants a license falsely stating that the Commission certified Aureus's compliance with the Regulations;

d.  Failing to disclose that Aureus was acting as a CPO and Matos was acting as an AP of a CPO while unregistered with the Commission, in violation of the Act and Regulations;

e.  Failing to disclose that Pool Participant funds were commingled with Matos's own funds;

f.  Misappropriating Pool Participant funds to pay Matos's personal expenses and debts, and to pay other Pool Participants fake returns in the nature of a Ponzi scheme;

g.  Failing to disclose that pool funds were misappropriated by Matos to pay Matos's own debts and personal purchases;

h.  Failing to disclose that pool funds were being used by Defendants to make Ponzi payments to other Pool Participants in order to hide the fraudulent nature of the scheme;

i.  Impersonating Firm A and misrepresenting that Aureus's inability to honor withdrawal requests were caused by an audit of Aureus's account at Firm A;

j.  Fabricating and providing false documents to Pool Participants purporting to be letters from Firm A, one of Aureus's FCMs, explaining an "audit process" to support Defendant's misrepresentations about Aureus's inability to honor withdrawal requests;

k.  Misrepresenting that Aureus's inability to honor withdrawal requests were caused by a hack of one of Aureus's trading accounts; and

l.   Misrepresenting and providing false account statements about the availability of Pool Participants' funds when such funds had been lost through unprofitable trading, misappropriated by Matos for personal expenses, or used to make Ponzi payments to other Pool Participants.

66.   Defendants directly engaged in the acts and practices described above intentionally, knowingly, or with reckless disregard for the truth of their representations or omissions.

67.   The acts or omissions of Matos described in this Complaint were done within the scope of his office, employment, or agency with Aureus. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Aureus is liable as a principal for each act, omission, or failure of Matos constituting a violation of 7 U.S.C. § 6b(a)(1)(A)–(C).

68.   Matos directly or indirectly controlled Aureus and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 7 U.S.C. § 6b(a)(1)(A)–(C) committed by Aureus.  Therefore, pursuant to 7 U.S.C. § 13c(b), Matos is also liable as a control person for each of Aureus's violations of 7 U.S.C. § 6b(a)(1)(A)–(C).

69.   Each act of misappropriation, misrepresentation, or omission of material fact, and creation and issuance of a false statement or document, made during the Relevant Period, including, but not limited to, those

26

specifically alleged herein, constitutes a separate and distinct violation of 7

U.S.C. § 6b(a)(1)(A)–(C).

### <u>COUNT TWO</u>
**Violations of Section 4*o*(1)(A)–(B) of the Act, 7 U.S.C. § 6*o*(1)(A)–(B)
(Fraud and Deceit by CPOs and APs of CPOs)**

70.     Paragraphs 1 through 60 are re-alleged and incorporated herein

by reference.

71.     Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i), defines a

commodity pool operator, in relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool,
> investment trust, syndicate, or similar form of enterprise, and
> who, in connection therewith, solicits, accepts, or receives from
> others, funds, securities, or property, either directly or through
> capital contributions, the sale of stock or other forms of securities,
> or otherwise, for the purpose of trading in commodity interests,
> including any—
>
> (I) commodity for future delivery, security futures product, or swap
> . . . .

72.     By reason of the foregoing, during the Relevant Period, Aureus

engaged in a business, for compensation or profit, that is of the nature of a

commodity pool, investment trust, syndicate, or similar form of enterprise,

and in connection therewith, solicited, accepted, or received from others,

funds, securities, or property, either directly or through capital contributions,

the sale of stock or other forms of securities, or otherwise, for the purpose of

trading in commodity interests; therefore, Aureus acted as a CPO, as defined by 7 U.S.C. § 1a(11).

73.   Regulation 1.3, 17 C.F.R. § 1.3 (2023), defines an associated person of a CPO as any natural person associated with:

> (3) A [CPO] as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

74.   By reason of the foregoing, during the Relevant Period, Matos was associated with a CPO as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool, or the supervision of any person or persons so engaged.  Therefore, Matos was an AP of a CPO as defined by 17 C.F.R. § 1.3.

75.   Section 4o(1)(A)–(B) of the Act, 7 U.S.C. § 6o(1)(A)–(B), prohibits CPOs and APs of CPOs, whether registered with the Commission or not, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes or artifices to defraud any client or participant or prospective client or participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

76.   Defendants committed these violations by, among other things:

a.  Misrepresenting expected profits by promising grossly inflated and guaranteed profits without any basis to make such claims or promises;

b.  Misrepresenting expected risk of loss by wholly negating any such risk in Defendants' solicitations to Pool Participants, including by providing "warranty checks" that falsely guaranteed Pool Participant contributions were available;

c.  Misrepresenting Aureus's registration with the Commission and compliance with the Regulations by providing Pool Participants a license falsely stating that the Commission certified Aureus's compliance with the Regulations;

d.  Failing to disclose that Aureus was acting as a CPO and Matos was acting as an AP of a CPO while unregistered with the Commission, in violation of the Act and Regulations;

e.  Failing to disclose that Pool Participant funds were commingled with Matos's own funds;

f.  Misappropriating Pool Participant funds to pay Matos's personal expenses and debts, and to pay other Pool Participants fake returns in the nature of a Ponzi scheme;

g.  Failing to disclose that pool funds were misappropriated by Matos to pay Matos's own debts and personal purchases;

h.  Failing to disclose that pool funds were being used by Defendants to make Ponzi payments to other Pool Participants in order to hide the fraudulent nature of the scheme;

i.  Impersonating Firm A and misrepresenting that Aureus's inability to honor withdrawal requests were caused by an audit of Aureus's account at Firm A;

j.  Fabricating and providing false documents to Pool Participants purporting to be letters from Firm A, one of Aureus's FCMs, explaining an "audit process" to support Defendant's misrepresentations about Aureus's inability to honor withdrawal requests;

k.  Misrepresenting that Aureus's inability to honor withdrawal requests were caused by a hack of one of Aureus's trading accounts; and

l.  Misrepresenting and providing false account statements about the availability of Pool Participants' funds when such funds had been lost through unprofitable trading, misappropriated by Matos for personal expenses, or used to make Ponzi payments to other Pool Participants.

77.  By reason of the foregoing, Aureus, through use of the mails or any means or instrumentality of interstate commerce: (1) knowingly or recklessly employed devices, schemes or artifices to defraud Pool Participants and prospective Pool Participants; or (2) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon Pool Participants or prospective Pool Participants.

78.  By reason of the foregoing, Aureus violated 7 U.S.C. § 6$o$(1)(A)– (B).

79.  The acts or omissions of Matos described in this Complaint were done within the scope of his office, employment, or agency with Aureus. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Aureus is liable as a principal for each act, omission, or failure of Matos constituting a violation of 7 U.S.C. § 6$o$(1)(A)–(B).

80.  Matos directly or indirectly controlled Aureus and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 7 U.S.C. § 6$o$(1) committed by Aureus.  Therefore, pursuant to

31

7 U.S.C. § 13c(b), Matos is also liable as a control person for each of Aureus's violations of 7 U.S.C. § 6*o*(1)(A)–(B).

81.     Each act of misappropriation, misrepresentation and omission of material fact, and creation and issuance of a false statement or document, including those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A)–(B).

**COUNT THREE**
**Violations of Sections 4k(2) and 4m(1) of the Act,**
**7 U.S.C. §§ 6k(2), 6m(1)**
**(Failure to Register as a CPO and an AP of a CPO)**

82.     Paragraphs 1 through 60 are re-alleged and incorporated herein by reference.

83.     Subject to certain exceptions not relevant here, 7 U.S.C. § 6m(1) states that it shall be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such . . . [CPO] . . . ."

84.     Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2) states that it shall be:

> [U]nlawful for any person to be associated with a [CPO] as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged, unless such person is registered with the Commission under this chapter as an [AP] of such [CPO] . . . .

85.     By reason of the foregoing, during the Relevant Period, Aureus engaged in a business, for compensation or profit, that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests; therefore, Aureus acted as a CPO, as defined by 7 U.S.C. § 1a(11).

86.     Aureus, while using the mails or means of interstate commerce in connection with its business as a CPO, has never been registered with the Commission as a CPO.

87.     By reason of the foregoing, Aureus acted as an unregistered CPO in violation of 7 U.S.C. § 6m(1).

88.     By reason of the foregoing, during the Relevant Period, Matos associated with a CPO (as defined by 7 U.S.C. § 1a(11)) as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool or the supervision of persons so engaged; therefore, Matos acted as an AP of a CPO as defined by 17 C.F.R. § 1.3.

33

89.     Matos has never been registered with the Commission as an AP of a CPO.

90.     By reason of the foregoing, Matos acted as an unregistered AP of a CPO in violation of 7 U.S.C. § 6k(2).

91.     The acts or omissions of Matos acting for Aureus described in this Complaint were done within the scope of his office, employment, or agency with Aureus.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Aureus is liable as a principal for each act, omission, or failure of Matos constituting a violation of 7 U.S.C. § 6k(2).

92.     Matos directly or indirectly controlled Aureus and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 7 U.S.C. § 6m(1) committed by Aureus.  Therefore, pursuant to 7 U.S.C. § 13c(b), Matos is also liable as a control person for each of Aureus's violations of 7 U.S.C. § 6m(1).

93.     Each instance that Aureus acted as a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

94.     Each instance that Matos acted as an AP of a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

**COUNT FOUR**
**Violations of Regulations 4.20(a)(1), (b), and (c),**
**17 C.F.R. § 4.20(a)(1), (b)–(c) (2023)**
**(Failure to Operate the Pool as a Separate Entity,**
**Failure to Receive Pool Participants' Funds in the Pool's Name,**
**and Commingling of Funds by a CPO)**

95.    Paragraphs 1 through 60 are re-alleged and incorporated herein by reference.

96.    17 C.F.R. § 4.20(a)(1) requires a CPO, whether registered with the Commission or not, to operate its commodity pool as a legal entity separate from that of the CPO.

97.    17 C.F.R. § 4.20(b) prohibits CPOs, whether registered or not, from receiving pool participants' funds in any name other than that of the pool.

98.    By reason of the foregoing, Aureus, while acting as CPO for the Aureus Pool, failed to operate the Aureus Pool as a legal entity separate from Aureus, and received Pool Participants' funds in the names of Matos and Aureus, rather than in the name of a commodity pool cognizable as a legal entity separate from Aureus.

99.    By reason of the foregoing, Aureus violated 17 C.F.R. § 4.20(a)(1) and (b).

100.    Each act of failing to operate the pool as a separate legal entity and improperly receiving Pool Participants' funds, including but not limited

to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.20(a)(1) and (b).

101.   Under 17 C.F.R. § 4.20(c), a CPO may not "commingle the property of any pool that it operates or that it intends to operate with the property of any other person."

102.   During the Relevant Period, Aureus, while acting in its capacity as CPO, caused Pool Participant funds to be commingled with funds of other persons, including funds belonging to Matos.

103.   By reason of the foregoing, Aureus commingled Pool Participant funds in violation of 17 C.F.R. § 4.20(c).

104.   Each commingling of a Pool Participant's funds is alleged as a separate and distinct violation of 17 C.F.R. § 4.20(c).

105.   Matos directly or indirectly controlled Aureus and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 17 C.F.R. § 4.20(a)(1), (b), or (c) committed by Aureus. Therefore, pursuant to 7 U.S.C. § 13c(b), Matos is also liable as a control person for each of Aureus's violations of 17 C.F.R. § 4.20(a)(1), (b), or (c).

## COUNT FIVE
### Violations of Regulation 4.21, 17 C.F.R. § 4.21 (2023)
### (Failure to Provide Pool Disclosure Documents)

106.   Paragraphs 1 through 60 are re-alleged and incorporated herein by reference.

107.   17 C.F.R. § 4.21(a)(1) provides, in pertinent part:

[E]ach commodity pool operator registered or required to be registered under the Act must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool prepared in accordance with §§ 4.24 and 4.25 by no later than the time it delivers to the prospective participant a subscription agreement for the pool . . . .

108.   By reason of the foregoing, during the Relevant Period, Aureus was required to be registered with the Commission as a CPO, but Aureus failed to provide prospective pool participants with pool disclosure documents in the form specified in Regulations 4.24 and 4.25, 17 C.F.R. §§ 4.24, 4.25 (2023).

109.   By reason of the foregoing, Aureus violated 17 C.F.R. § 4.21.

110.   Matos directly or indirectly controlled Aureus and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 17 C.F.R. § 4.21 committed by Aureus.  Therefore, pursuant to 7 U.S.C. § 13c(b), Matos is also liable as a control person for each of Aureus's violations of 17 C.F.R. § 4.21.

111.   Each failure to furnish the required disclosure documents to prospective Pool Participants and Pool Participants, including those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.21.

## VI.  <u>RELIEF REQUESTED</u>

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.  An order finding that Defendants violated Sections 4b(a)(1)(A)–(C), 4k(2), 4m(1), and 4*o*(1)(A)–(B) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)–(C), 6k(2), 6m(1), 6*o*(1)(A)–(B), and Regulations 4.20(a)(1), (b), and (c) and 4.21(a)(1), 17 C.F.R. §§ 4.20(a)(1), (b)–(c), 4.21(a)(1) (2023);

B.  An order of permanent injunction enjoining Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6b(a)(1)(A)–(C), 6k(2), 6m(1), and 6*o*(1)(A)–(B), and 17 C.F.R. §§ 4.20(a)(1), (b)–(c) and 4.21(a)(1);

C.  An order of permanent injunction restraining and enjoining Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

      1.  Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2.  Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2023)) for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3.  Having any commodity interests traded on any Defendant's behalf;

4.  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5.  Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interest;

6.  Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2023); and/or

7. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2023)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38), registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9));

D.    An order directing Defendants, as well as any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, fees, or loans derived directly or indirectly from acts or practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

E.    An order directing Defendants, as well as any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to every customer and investor whose funds Defendants received, or caused another person or entity to receive, as a result of the acts and practices constituting violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

F.    An order directing Defendants, as well as any successors thereof, to rescind, pursuant to such procedure as the Court may order, all contracts and agreements, whether express or implied, entered into between, with, or among Defendants and any customer or investor whose funds were received by the Defendants as a result of the acts and practices which constituted violations of the Act and the Regulations, as described herein;

G.    An order requiring Defendants to pay a civil monetary penalty of not more than the civil monetary penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13(a)-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2023), as amended by 89 Fed. Reg. 4544 (Jan. 24, 2024), for each violation of the Act or Regulations, plus post-judgment interest;

H.    An order requiring Defendants and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

I.    An order providing such other and further relief as the Court deems proper.

Dated:  September 4, 2024       Respectfully submitted,

**COMMODITY FUTURES TRADING COMMISSION**

By: ***/s/ Alan T. Simpson***
Rachel Hayes, rhayes@cftc.gov
Alan T. Simpson,* asimpson@cftc.gov
     *Lead Counsel*
Attorneys for Plaintiff
COMMODITY FUTURES TRADING COMMISSION
2600 Grand Blvd., Suite 210
Kansas City, MO 64108
(816) 960-7700
(816) 960-7751 (fax)